# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

CLEO HATCH,

Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION LLC,

Defendants.

Case No.: 2:26-cv-10843

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**1.  FCRA, 15 U.S.C. § 1681, *et seq.***

Plaintiff Cleo Hatch ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* against Defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), and Trans Union LLC ("Trans Union") (collectively, "Defendants").

## INTRODUCTION

1.      Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* by Defendants.  Plaintiff contends Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's "consumer reports" as defined in 15 U.S.C.

1

§ 1681a(d), and consequently reported inaccurate information about Plaintiff. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

## JURISDICTION AND VENUE

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the Fair Credit Reporting Act, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3. Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

4. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5. Plaintiff is a natural person who resides in Macomb, Michigan.

6. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

7.      Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).  On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

8.      Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

9.      Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served through

3

its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

10.     During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

11.     Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and therefore are "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

12.     During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

13.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## FACTUAL BACKGROUND

14.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

4

15.   The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

16.   Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

17.   The FCRA is intended to ensure consumer reporting agencies ("CRAs") exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because CRAs have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

18.   Defendants, comprising the three major CRAs in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

19.   Defendants regularly purchase and obtain consumer bankruptcy information to include in consumer reports.

20.   Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes

5

the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

21.     Defendants obtain consumer information from various sources. Some consumer information is sent directly to Defendants by furnishers, and other information is independently gathered by Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

22.     Defendants regularly seek out and procure consumer bankruptcy filing and discharge information, with the intention of including it in the consumer reports Defendants sell to third parties for a profit.

23.     The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

6

24. Defendants' unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

25. Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

26. The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions.

27. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in the consumer's consumer report, which is based on the amount of reported debt, payment history, and dates of delinquencies contained in Defendants' reports.

28. The information Defendants include in a consumer report contributes to the consumer's overall creditworthiness and determines their FICO Scores.

29. FICO Scores are calculated using information contained in Defendants' consumer reports.

30.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of his or her creditworthiness.

31.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a.  "Payment history" refers to whether the consumer has paid his or her bills in the past, and whether those payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower the consumer's FICO Score will be. A collection account is highly damaging to credit scores.

b.  The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that the consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact the consumer's credit score.

32.     Lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

33.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

34.     Defendants regularly provide information that allows lenders to calculate the "total amount of debt" a consumer owes based on the total debt reported by Defendants.

35.     A consumer's income, however, is not included in his or her consumer report; only his or her "amount of debt" is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in a consumer's credit score but is a factor in credit decisions.

36.     The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for the consumer to obtain credit and favorable credit terms (e.g., higher interest rates and lower credit limits).

37.     Upon information and belief, a consumer who has obtained a bankruptcy discharge and has an account that is inaccurately reporting with outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting with a zero-dollar balance, especially if that account is an open "collection" with a balance owed, as is the case here.

9

38.     The CRAs (through their Consumer Data Industry Association) created, maintain, and license the industry guidelines to furnishers through the Credit Reporting Resource Guide® ("CRRG"), detailing how furnishers should report consumer data to the CRAs using the Metro 2 Format and codes.

39.     The 2020 CRRG, page 10-1, states that "Accounts of consumers who have filed petitions for Bankruptcy (Third Party Collection Agencies) . . . **must be deleted**."

40.     Thus, Defendants are aware that collections for debts which were included in a bankruptcy should be deleted from the consumer's credit report following the filing of a bankruptcy.

41.     Defendants are aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding, are discharged.

42.     However, Defendants also know that it is rare for a pre-petition debt to be reaffirmed or successfully challenged in an adversary proceeding.

43.     Further, Defendants know that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket sheet.

44.     Additionally, information indicating whether a specific debt was reaffirmed or successfully challenged through an adversary proceeding (rather than discharged) can be easily retrieved from the same sources from which Defendants independently obtain consumer bankruptcy case information.

45.     Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

46.     Despite the availability of accurate consumer information, Defendants regularly report inaccurate information about accounts after consumers receive a Discharge Order.

47.     Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

48.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts based on information they know is incomplete or inaccurate.

49.     Consequently, Defendants regularly publish consumer information that conflicts with information provided by data furnishers to Defendants, already included in Defendants' credit files, contained in public records that Defendants regularly access, or sourced through Defendants' independent and voluntary efforts.

11

50.     Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

51.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, information provided by furnishers, and data contained in Defendants' own files.

52.     Defendants also know that failing to report the effect of a discharge on consumer account tradelines, while reflecting a bankruptcy on a credit report, would reasonably be understood to declare to the world that the consumer had been in bankruptcy but had not received a discharge of a particular account. This not only inaccurately/incorrectly reflects an outstanding debt, but also would reasonably suggest to a consumer and those reviewing the consumer's credit report that the consumer was guilty of a bad act for which he did not deserve a discharge of a particular debt.[1]

---

[1] Indeed, a bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 287 (1991), and will not be provided to someone who filed bankruptcy in bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious injury. 11 U.S.C. §§ 727(a), 523(a).

53. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

54. Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures. More specifically, Defendants are on continued notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

*Allegations Specific to Credit Reporting of Plaintiff*

55. Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about September 6, 2024, in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 24-48591-tjt).

56. Plaintiff received an Order of Discharge on or about December 10, 2024.

57. Thereafter, Plaintiff was not personally liable for his dischargeable debts. All dischargeable debts carried zero-dollar balances after the bankruptcy discharge.

58. Defendants each prepared one or more consumer reports concerning Plaintiff after he was discharged from Chapter 7 Bankruptcy.

59. The allegations in this complaint against Defendants are based on the reporting by Defendants in Plaintiff's January 29, 2025 consumer disclosures.

60.     Defendants obtained notice of Plaintiff's Chapter 7 bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by Defendants in Plaintiff's consumer reports.

61.     In the Public Records section of Plaintiff's consumer reports, Defendants each included the bankruptcy case number, court, filing date, and the fact that Plaintiff was discharged from Chapter 7 Bankruptcy in December 2024.

62.     Defendants also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

63.     Defendants reported several of Plaintiff's accounts/tradelines as "discharged in bankruptcy," and/or with a zero-dollar balance.

64.     Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

65.    Defendants should have reported **all** of Plaintiff's unsecured dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance but did not.

66.    Defendants inaccurately reported Plaintiff's Upstart Network Inc. account (the "Upstart Account"), ending with ****2513 and opened in June 2021, which pre-dated Plaintiff's bankruptcy filing.

67.    The Upstart Account was included in Plaintiff's bankruptcy and was discharged on or about December 10, 2024. Therefore, the Upstart Account should have been reported as discharged in bankruptcy, and with a zero-dollar balance.

68.    However, Defendants each inaccurately reported the Upstart Account as a "Collection/Charge-Off" account with a balance of $2,372.00.

69.    Additionally, Experian and Trans Union each inaccurately reported Plaintiff's FEB/OppLoans account (the "FEB Account"), ending with ********5763 and opened in April 2022, which pre-dated Plaintiff's bankruptcy filing.

70.    The FEB Account was included in Plaintiff's bankruptcy and was discharged on or about December 10, 2024. Therefore, the FEB Account should have been reported as discharged in bankruptcy, and with a zero-dollar balance.

71.    However, Experian and Trans Union each inaccurately reported the FEB Account as a "Charge-Off" account with a balance of $113.00.

15

72.     Defendants failed to report that the Upstart Account was discharged in bankruptcy and that it had a zero-dollar balance, despite each Defendant reporting Plaintiff's bankruptcy in the public records section of Plaintiff's respective consumer reports, and reporting other pre-bankruptcy accounts as "Discharged/Included in Bankruptcy Chapter 7," and/or with zero-dollar balances.

73.     Further Trans Union and Experian also failed to report the FEB Account was discharged in bankruptcy and that it had a zero-dollar balance.

74.     The status of "Charge-Off" in the consumer means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as "included in and/or discharged in bankruptcy," or the tradeline(s) indicate there is a balance and/or past due balance owed on the account before or after the "charge-off."

75.     The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

16

76.     According to Equifax,[2] Experian,[3] and Trans Union[4], a charge-off means the lender has written the account off as a loss and the account is closed to future charges. The timeframe is generally between 120 and 180 days after the consumer becomes delinquent, and a charge-off does not mean that the consumer no longer owes the debt. The consumer is still legally obligated to pay the debt.

77.     Upon information and belief, Upstart Inc. furnished information to Defendants that indicated the Upstart Account was included or discharged in bankruptcy and/or had a zero-dollar balance after Plaintiff's bankruptcy discharge, but Defendants rejected or otherwise overrode the data they received.

78.     Upon information and belief, FEB/OppLoans furnished information to Defendants that indicated the FEB Account was included or discharged in bankruptcy and/or had a zero-dollar balance after Plaintiff's bankruptcy discharge, but Experian and Trans Union rejected or otherwise overrode the data they received.

79.     Alternatively, Defendants knew from past experiences that Upstart furnished inaccurate information regarding discharged debts or has historically

---

[2] https://www.equifax.com/personal/education/credit/report/articles/-/learn/charge-offs-faq/#:~:text=What%20does%20%E2%80%9Ccharge%2Doff%E2%80%9D,transferred%20to%20a%20collection%20agency.
[3] https://www.experian.com/blogs/ask-experian/what-is-a-charge-off/#:~:text=A%20charge%2Doff%20is%20a,for%20paying%20back%20the%20debt.
[4] https://www.transunion.com/blog/credit-advice/what-is-a-charge-off?atvy=%7B%22261809%22%3A%22Experience+B%22%7D

17

failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

80.    Additionally, Experian and Trans Union knew from past experiences that FEB/OppLoans furnished inaccurate information regarding discharged debts or has historically failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

81.    Nevertheless, Defendants blindly relied on the information provided by Upstart even though this information conflicted with, or was contradicted by, information contained in Defendants' own records, contradicted other information Defendants reported about Plaintiff, was in violation of the Credit Reporting Resource Guide (CRRG), and/or neglected Defendants' knowledge regarding Plaintiff's bankruptcy and discharge.

82.    Additionally, Experian and Trans Union blindly relied on the information provided by FEB/OppLoans even though this information conflicted with, or was contradicted by, information contained in Experian and Trans Union's own records, contradicted other information Experian and Trans Union reported about Plaintiff, was in violation of the CRRG, and/or neglected Experian's and Trans Union's knowledge regarding Plaintiff's bankruptcy and discharge.

83.    Defendants' reliance on Upstart was therefore unreasonable.

84.     Additionally, Experian's and Trans Union's reliance on FEB/OppLoans was therefore unreasonable

85.     Defendants do not have reasonable procedures in place to detect and correct pre-Chapter 7 debts which continue to report balances after Defendants report a discharge.

86.     If Upstart did not furnish data to Defendants that the Upstart Account was discharged, Defendants' blind reliance on Upstart was unreasonable.

87.     If FEB/OppLoans did not furnish data to Experian and Trans Union that the FEB Account was discharged, Defendants' blind reliance on FEB/OppLoans was unreasonable.

88.     Further, Defendants knew, from their own CRRG guidelines, that Defendants should not report a collection for discharged debt, even if the furnisher reported the information to Defendants.

89.     Defendants inaccurately reported that Plaintiff owed balances that Plaintiff did not actually owe, and also reported inaccurate account statuses.

90.     Defendants failed to indicate that the Upstart Account was discharged in Chapter 7 Bankruptcy.

91.     Defendants inaccurately reported the Upstart Account with a balance owed after the account was discharged in Chapter 7 Bankruptcy.

92.     Additionally, Experian and Trans Union failed to indicate that the FEB Account was discharged in Chapter 7 Bankruptcy.

93.     Additionally, Trans Union and Experian inaccurately reported the FEB Account with a balance owed after the account was discharged in Chapter 7 Bankruptcy.

94.     Pursuant to Defendants' own CRRG guidelines, Defendants should not have reported any collection for debt which pre-dated Plaintiff's bankruptcy.

95.     Defendants' reporting of the Upstart Account is patently false and therefore inaccurate.

96.     If not patently false, Defendants' reporting of the Upstart Account is materially misleading and therefore inaccurate.

97.     Additionally, Experian's and Trans Union's reporting of the FEB Account is patently false and therefore inaccurate.

98.     If not patently false, Experian's and Trans Union's reporting of the FEB Account is materially misleading and therefore inaccurate.

### *Plaintiff's Damages*

99.     Upon information and belief, had Defendants accurately reported Plaintiff's credit report, Plaintiff's credit scores would have been better.

100.   Open collection/charge-off accounts with balances are especially harmful to a consumer's FICO and other credit scores, especially after a bankruptcy discharge.

101.   FICO scores treat a single collection account nearly as derogatory as a bankruptcy filing in terms of credit score loss.

102.   Defendants' reporting of additional debt which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

103.   The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

104.   The inaccurate reporting by Defendants suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the Accounts.

105.   After Plaintiff's bankruptcy discharge, in or around March 2025, Plaintiff applied for credit with Credit One Bank but was denied due to Experian's inaccurate reporting.

106.   Additionally, in or around March 2025, Plaintiff applied for credit with Barclays Bank but was denied due to Trans Union's inaccurate reporting.

21

107. Additionally, in or around March 2025, Plaintiff applied for credit with Chase but was denied due to Trans Union's and Experian's inaccurate reporting.

108. Additionally, in or around March 2025, Plaintiff applied for credit with US Bank but was denied due to Trans Union's inaccurate reporting.

109. Additionally, in or around April 2025, Plaintiff applied for credit with Suburban Chrysler DO, TD Auto Finance, NCC Genesis Cadillac, Crescent Bank, Ally Financial, – Regional Acceptance, GM Financial, and LaFontaine Chevrolet but was denied due to Trans Union's inaccurate reporting.

110. Additionally, in or around April 2025, Plaintiff applied for credit with MSU Federal Credit Union, ML/MI Schools and Government, Global Lending Services, Exeter Finance, Santander, Westlake Financial, but was denied due to Experian's inaccurate reporting.

111. Additionally, in or around April 2025, Plaintiff applied for credit with Pat Milliken Ford and Ally Financial but was denied due to Trans Union's and Experian's inaccurate reporting.

112. Additionally, in or around May 2025, Plaintiff applied for credit with First Electronic Bank and Synchrony Financial but was denied due to Trans Union's inaccurate reporting.

113. Additionally, between March 2025 and August 2025, multiple potential creditors, including but not limited to, Verizon, Capital One NA,

Bristol West Insurance Company, and Comcast viewed Plaintiff's Equifax credit report but none extended offers of credit to Plaintiff due to Equifax's inaccurate reporting.

114. Defendants' inaccurate reporting, along with additional information belonging to Plaintiff, was published to multiple creditors by Defendants.

115. As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, credit denials, and other financial harm.

116. As a direct result of Defendants' inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred, related to Defendants' inaccurate reporting.

117. Specifically, due to Defendants' inaccurate reporting, Plaintiff incurred attorneys' fees for a necessary review of his credit reports.

118. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, humiliation, loss of sleep, headaches, stress, anger, reputational damage, invasion of privacy, frustration, shock, embarrassment, and anxiety.

## COUNT I
### Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

23

119. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

120. The FCRA requires CRAs, like Defendants, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

121. Defendants negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of the information they reported about Plaintiff's pre-bankruptcy debts after he received a Discharge Order.

122. Defendants independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily included it in Plaintiff's consumer reports.

123. When Defendants voluntarily procured and reported Plaintiff's bankruptcy information and pre-petition accounts, they had an obligation to follow reasonable procedures to ensure they reported the bankruptcy discharge and its effect(s) with maximal accuracy.

124. Defendants received notice of Plaintiff's bankruptcy discharge through public records, their own files, and information provided by data furnishers.

125.   Individual furnishers of account information also notified Defendants of Plaintiff's bankruptcy, as evidenced by other tradelines in Plaintiff's consumer report that are labeled as included and discharged in bankruptcy.

126.   Defendants had actual knowledge of Plaintiff's Chapter 7 Bankruptcy and Discharge Order, as evidenced by the information they published in Plaintiff's consumer reports, including Plaintiff's bankruptcy case number, court, date of filing, and date of discharge.

127.   Defendants also had actual knowledge that the Upstart Account was discharged in Plaintiff's bankruptcy.

128.   But despite knowledge of Plaintiff's bankruptcy and the discharge of the subject debt, Defendants inaccurately reported accounts which pre-dated Plaintiff's Chapter 7 Bankruptcy, with statuses other than "discharged in bankruptcy" and balances greater than zero.

129.   In around 2009, Defendants implemented their own automated software "bankruptcy scrubs" following the settlement agreement in *White v. Experian Info. Sols., Inc.,* No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

130.   Defendants' bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

131.   In other words, Defendants' automated bankruptcy scrubs assume Defendants' notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendants will override data reported by a furnisher according to Defendants' assumptions and algorithms.

132.   However, Defendants have intentionally chosen to disregard knowingly inaccurate open balances and payment obligations of certain types of pre-bankruptcy accounts in Defendants' software programming of their automated "bankruptcy scrubs" they have been employing for well over a decade.

133.   Defendants knew or should have known of their obligations under the FCRA, especially those pertaining to reporting discharged debt with a zero-dollar balance.

134.   These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and exemplified in prior cases involving Defendants from which Defendants are on notice of their unreasonable procedures concerning the reporting of discharged debts.

135.   Additionally, Defendants possess or could easily obtain substantial written materials that detail CRAs' duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

136. Despite knowledge of these legal obligations, Defendants willfully and knowingly breached their duties in violation of 15 U.S.C. § 1681e(b). Accordingly, Defendants deprived Plaintiff of his rights as a consumer under the FCRA.

137. Not only did Defendants have prior notice of their unreasonable procedures for reporting discharged debts, but they also possessed information from which they should have known the information reported about Plaintiff was inaccurate.

138. Defendants knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

139. Defendants know that discharged pre-petition debts should not be reported as late, past due, as collections, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

140. Further, Defendants' own industry guidelines in the CRRG state that collections for debts included in bankruptcy should be "deleted" from consumer reports.

141. Yet in this case, Defendants reported the accounts, which pre-dated Plaintiff's bankruptcy, as "Charge-Off" accounts without any indication the accounts were discharged.

142. Defendants further reported the Upstart Account with a non-zero-dollar balance.

143. Trans Union and Experian further reported the FEB Account with a non-zero-dollar balance.

144. Alternatively, Defendants did not delete the inaccurately reported accounts from Plaintiff's consumer report, in compliance with the CRRG.

145. Defendants violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/consumer report.

146. Defendants also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendants knew or should have known the information they were reporting is inaccurate, and/or otherwise contradicted by information known by Defendants, reported to Defendants, and reasonably available to Defendants.

147. Defendants further violated 15 U.S.C. § 1681e(b) by failing to have reasonable procedures in place to prevent the reporting of a collection account when that debt pre-dated a consumer's bankruptcy and was in fact discharged.

148. Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

149. Alternatively, Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

28

150.   Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

151.   Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denials, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and failing to delete the Accounts in compliance with the CRRG.

152.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, loss of sleep, reputational harm, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

153.   Defendants are direct and proximate causes of Plaintiff's damages.

154.   Defendants are substantial factors in Plaintiff's damages.

155.   Therefore, each Defendant is individually liable for actual and statutory damages, punitive damages, attorneys' fees, and costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants for the following:

(a)   Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b);

29

(b)     An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)     An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)     An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(e)     An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED on March 13, 2026

By: /s/ Adam Hubbi
Adam Hubbi, CA #359827
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1505
F: (480) 613-7733
E: ahubbi@consumerjustice.com